**Johnathan JOHNSON, Plaintiff–Appellant,**

v.

**John SCHMIDT, Captain, Shield # 427, Clinton Myrick, Corrections Officer, Shield # 9242, Defendants–Appellees.**

No. 1131, Docket 95–2670.

United States Court of Appeals, Second Circuit.

Submitted Feb. 22, 1996.

Decided April 25, 1996.

Johnathan Johnson, Comstock, N.Y., submitted a pro se brief.

Alan G. Krams, Asst. Corp. Counsel, New York City Law Dept., New York City, submitted a brief for appellees.

Before NEWMAN, Chief Judge, LUMBARD and KEARSE, Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal concerns two novel aspects of trial procedure: (1) the use of the same jury to try sequentially two unrelated civil cases, and (2) the use of court employees to act as standby counsel for a *pro se* litigant. These matters come before us on an appeal by Johnathan Johnson from the August 31, 1995, judgment of the United States District Court for the Eastern District of New York (Charles R. Wolle, Chief Judge of the Southern District of Iowa, sitting by designation). The judgment, entered after a jury trial,

rejected Johnson's suit alleging misconduct by prison officials. The same jury had previously rejected Johnson's misconduct lawsuit against officials at a different prison. We conclude that the lack of informed consent to the novel procedure of using the same jury to try appellant's two lawsuits necessitates a retrial of the second case. We also disapprove the practice of using court employees to serve as standby counsel for a *pro se* litigant.

## Background

While confined at the Rikers Island Correctional Facility ("Rikers"), Johnson filed a complaint against Captain John Schmidt and Officer Clinton Myrick, corrections officers at Rikers, making the following allegations. Captain Schmidt placed Johnson in a cellblock with an inmate named Devine, with whom Johnson had "a problem." Devine and another inmate subsequently set Johnson's cell on fire. Officer Myrick responded with a fire extinguisher and proceeded to spray Johnson instead of the fire. Myrick then released Johnson from his cell, told the assembled inmates, "I don't see anything," and stood by as Johnson was attacked by the other inmates. The inmates struck and kicked him in the face.

Johnson was taken to the clinic at Rikers, where a doctor said there was nothing wrong with him, other than that his mouth was bleeding. Later X-rays were taken at Kings County Hospital and the Rikers Clinic, and Johnson was told he was "O.K." After a transfer to the Brooklyn House of Detention, X-rays disclosed a facial bone fracture, surgery was performed, and Johnson's jaw was wired shut for six weeks.

Johnson's suit against Schmidt and Myrick was assigned for jury trial before Judge Wolle, as was Johnson's other, unrelated suit against corrections officers at the Queens House of Detention, *Johnson v. Sokol*, CV–88–1557 (E.D.N.Y.1988). In this other suit, Johnson alleged that the defendant officers assaulted him while he was confined at their institution. Judge Wolle requested two *pro se* law clerks employed by the District Court for the Eastern District to assist Johnson as "standby counsel," his request for appointed

counsel having been previously denied. Judge Wolle then suggested that both of Johnson's cases be tried sequentially to the same jury. An assistant corporation counsel for New York City, representing the defendants in both cases, objected. One of Johnson's standby counsel told the Judge she did not think the proposed procedure was a good idea. Johnson acquiesced in the procedure, though he did so without any indication that he understood the hazards of doing so.

Johnson's suit against the officers from the Queens jail was tried first. At the outset of that trial, Judge Wolle identified the two standby counsel to the jury as employees of the court office that assists unrepresented litigants and explained their limited standby role.

One episode at the first trial is pertinent to the pending appeal. During the first trial, a witness stated that Johnson was "affiliated with Fat Cat in a cop shooting in the Borough of Queens in 1988." Judge Wolle instructed the jury to disregard the comment.

The jury in the first trial returned a verdict in favor of the defendants. Within a few minutes after the verdict, the trial of Johnson's second case began before the same jury. At the conclusion of the evidence, Johnson moved for a mistrial on the ground that he had been prejudiced by the remark at the first trial concerning his involvement in a "cop shooting." He asked that a new jury be empaneled. The motion was denied. The jury returned a verdict in favor of the defendants in the second case.

## Discussion

The use of the same jury that has already heard a plaintiff's prior case to decide the plaintiff's subsequent case is a highly unusual procedure, one that appears not to have been considered in any reported decision. Indeed, the three members of this panel, with an aggregate of 82 years of judicial service, have never encountered or heard of such an occurrence. The practice is fraught with dangers. First, if the evidence at the first trial persuades the jury that the plaintiff is not a credible witness, it will be very difficult for the same jury to make an independent as-

sessment of the plaintiff's credibility at the trial of the second case. Second, evidence prejudicial to the plaintiff might be injected into the first trial, either by the defendants' design or through unexpected volunteering by a witness. If this occurs in the first trial, the plaintiff might be obliged to accept the limited comfort of a judge's "curative" instruction to disregard the prejudicial testimony, but the use of the same jury to decide the second case unnecessarily subjects the plaintiff to the risk that the "cure" will not suffice.

Of course, it is possible for fully informed parties to agree beforehand that the same jury will hear two cases brought by (or against) one of the parties. Such agreement is somewhat similar to a consensual consolidation of the two cases, except that the presentation of the evidence and the jury's deliberations are sequential. The parties might conclude that the saving of time and expense to select a second jury serves their convenience and outweighs the risks of untoward consequence, although the time to select a second jury from a venire already assembled for selection of the first jury would normally be minimal. Both parties might also believe that the risk of prejudicial testimony is slight, and both might have such confidence in the jury's assessment of their credibility that each party anticipates that a favorable assessment from the first trial will redound to that party's benefit at the second trial.

If parties who are represented by counsel consent to such a procedure, and the trial judge, in the exercise of broad discretion, permits the procedure to be used, we see no reason why the outcome of the second trial should be disturbed on appeal solely because the procedure was used. But different considerations apply where a litigant is proceeding *pro se.* As we have previously stated, "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). A clear example of this principle is the caution the Supreme Court has required where a *pro se* criminal defendant waives the right to be represented by counsel

and asserts a right of self-representation. *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). "[H]e should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942)); *see also United States v. Tompkins,* 623 F.2d 824, 827–28 (2d Cir.1980). This principle has also led us to require explicit warning to a *pro se* litigant that failure to object to a magistrate judge's report to a district judge will preclude appellate review. *See Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989); *see also United States v. Pennycooke,* 65 F.3d 9, 12 n. 2 (3d Cir.1995) (reserving issue of whether *pro se* criminal defendant needs to be informed of the right to testify).

 Though we need not go so far as to say that there is a right to a jury that is distinct from the jury that decided a party's prior case, we hold that the same jury may not be used for two unrelated cases brought by a *pro se* litigant unless fully informed consent is given. *See Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541 (informed consent to self-representation); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (informed consent to waiver of right to counsel); *United States v. Curcio,* 694 F.2d 14, 24–25 (2d Cir.1982) (informed consent to waiver of right to conflict-free counsel). Conceivably, a trial court's questioning of the *pro se* litigant might reveal the litigant's awareness of the risks of using the same jury, but, since the procedure is so unusual, it will normally be necessary for the trial judge to provide a *pro se* litigant some explanation of the risks inherent in this novel procedure and a caution of the sort that properly attends the surrender of important rights.

 In the pending case, the District Judge made no inquiry to determine whether Johnson understood the risks of the Judge's proposed procedure and gave Johnson no explanation of, or caution about, the risks of accepting the same jury for his two cases.

Moreover, one of appellant's standby counsel told the Judge that she did not think the Judge's proposed procedure was a good idea. Under these circumstances, Johnson's acquiescence cannot be regarded as an informed consent.

Furthermore, one of the hazards of using the same jury for both trials was realized when a witness at the first trial volunteered the prejudicial testimony that Johnson was involved in a "cop shooting." Once that testimony was given, the District Judge, aware that the defendants had objected to the use of the same jury for both trials and that the *pro se* plaintiff had not given informed consent, should have aborted his novel procedure and empaneled a new jury for the second case. Even if the need to give a curative instruction to the jury at the first trial did not alert the District Judge to the danger that the second trial would be needlessly tainted by the stricken testimony, appellant's motion for a mistrial during the second trial, based on the prejudicial testimony, should have brought to the Judge's attention the inadvisability of having the same jury decide the second case.

Under all of the circumstances, we conclude that the appellant is entitled to a new trial.

■ Since a new trial is required, we take this occasion to express serious concern about the District Judge's enlistment of two court employees to act as standby counsel for appellant. The designation of standby counsel has been authoritatively approved, *see Faretta*, 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46; *see also McKaskle v. Wiggins*, 465 U.S. 168, 178–79, 104 S.Ct. 944, 951, 79 L.Ed.2d 122 (1984) (delineating role of standby counsel). But the use of court employees to fill that role is at best a dubious practice. If the employment relationship comes to the attention of the jurors, as it did here, there are risks of prejudice either for or against the *pro se* litigant. The jurors might think that the Court is somehow siding with the party whom the court employee is assisting. On the other hand, the jurors might think the Court is belittling the worth of the *pro se* litigant's case by assigning as standby counsel a court employee, rather than a lawyer

unaffiliated with the Court, as would normally occur. There is also the further risk that a *pro se* litigant's subsequent displeasure with the advice of standby counsel, whether justified or not, places the litigant in the awkward position of asking the Court to assess the performance of one of its own employees.

■ In the pending case, standby counsel were two employees of the District Court's *pro se* office. Though such employees frequently give helpful advice to *pro se* litigants concerning the general procedures to follow in filing a complaint or motion, or taking an appeal, it is quite beyond their appropriate role to render specific advice to a litigant concerning the variety of legal issues that arise in the course of a trial. Moreover, *pro se* law clerks are often young attorneys, lacking any significant trial experience.

We can appreciate that the limited availability of counsel willing to accept court appointment in civil cases or to act as standby counsel might sometimes prompt a District Court to enlist the aid of a court employee to act as standby counsel for a *pro se* litigant, but we strongly recommend against use of such personnel for this purpose.

## Conclusion

The judgment is reversed, and the case is remanded for a new trial. In view of our disposition, we need not decide whether appellant's request for appointed counsel was properly denied; this matter may be considered anew prior to the retrial of appellant's case.