Marie Haydee Beltran **TORRES**,
Petitioner–Appellant,

v.

**UNITED STATES of America,**
Respondent–Appellee.

Docket 97–2061.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1997.

Decided March 25, 1998.

Stephen M. Sinaiko, Kramer, Levin, Naftalis & Frankel, New York, NY (David S. Frankel and Randall K. Packer, on the brief), for Petitioner–Appellant.

Michael A. Simons, Asst. U.S. Atty, New York, NY (Mary Jo White, U.S. Atty for S.D. of New York, Craig A. Stewart, Asst. U.S. Attorney, New York, NY, on brief), for Respondent–Appellee.

Before: NEWMAN, ALTIMARI and CALABRESI, Circuit Judges.

ALTIMARI, Circuit Judge:

Like the Phoenix, this case rises from the smoldering ashes of a young woman's discarded political beliefs. Almost two decades ago, petitioner-appellant Marie Haydee Beltran Torres ("Torres"),[1] a member of the Fuerzas Armada de Liberacion Nacional ("FALN"),[2] believing that the United States was Puerto Rico's enemy, took the position that United States' courts had no jurisdiction over those who supported Puerto Rican independence.

Torres was indicted for the 1977 bombing of the Mobil Oil Building in Manhattan, for which the FALN claimed responsibility, and which resulted in the death of one man and injury to several others. At her trial, Torres refused the appointment of counsel, demanded to represent herself and then informed the district court that she would neither present a defense nor participate in the proceedings. Firm in her political stance, Torres declined every opportunity during a three-day trial to change her mind. After a guilty verdict was announced, the district court decided to submit the question of punishment to the jury and conducted a separate sentencing hearing to determine whether Torres should be sentenced to life imprisonment pursuant to 18 U.S.C. § 34. Torres refused to participate in the sentencing hearing and presented no mitigating evidence. Convicted and sentenced to life imprisonment, Torres did not pursue the court-initiated appeal on her behalf.

Fifteen years later, Torres claimed she was denied her constitutional rights under the Fifth, Sixth and Eighth Amendments.

She now appeals from an order entered on November 27, 1996 in the United States District Court for the Southern District of New York (Knapp, *J.*), denying her petition to vacate her sentence and conviction pursuant to 28 U.S.C. § 2255.

The unusual sequence of events surrounding this case necessitates a review of the rights granted and the burdens imposed by our Constitution. Today we consider: (1) whether a defendant knowingly and intelligently waived her Sixth Amendment right to counsel when she refused to raise a defense or participate in the proceedings and when she subsequently learned that the jury would determine her sentence; (2) whether the Due Process Clause of the Fifth Amendment was violated by the absence of mitigating evidence at the sentencing hearing; and (3) whether a defendant's sentence of life imprisonment pursuant to a statute that failed to identify mitigating factors constitutes cruel and unusual punishment in violation of the Eighth Amendment. Having considered each of these questions, we find no basis to undo Torres' trial, and, accordingly, we affirm the district court's denial of her petition to vacate her sentence and conviction.

## BACKGROUND

### The Underlying Case

In September 1977, a grand jury indicted Torres, charging her with destruction of property in interstate commerce by means of an explosive, which resulted in the death of a Mobil employee, in violation of 18 U.S.C. § 844(i). Torres remained a fugitive until her arrest on April 4, 1980.

### Pre–Trial Proceedings

At her arraignment on April 16, 1980, Torres was accompanied by two attorneys, Elizabeth M. Fink, Esq., and Mara Siegal, Esq.[3] Torres described herself as a Puerto Rican freedom fighter and refused to recognize the

---

1. Petitioner now uses her maiden name, "Beltran."

2. The FALN is a terrorist group that used violence to promote its agenda in support of Puerto Rican independence from the United States.

3. Ms. Siegal and Ms. Fink, in addition to Michael Deutsch, Esq., served at various stages of the proceedings as Torres' legal advisors, but informed the district court that they did not represent Torres.

authority of the court. Declaring herself to be a "prisoner of war," she demanded that her case be tried before an international court. Torres unequivocally stated her position:

> Torres: I'm here representing myself and I don't need attorneys. I don't need Court-appointed attorneys. I don't need to hire any attorneys. I can very well represent myself in this so-called court, which I consider an illegal court, illegal proceeding.
>
> . . . . .
>
> Now, I will be speaking in this court on my behalf. I have absolutely nothing, nothing to defend myself against because I have committed no crimes.
>
> My legal advisers, and that is what they are, they are advisers, and when I choose to speak to them, that is when I want their advice.

> The Court: You mean Ms. Fink and Ms. Siegal?

> Torres: I do not want any appointed lawyers. I do not want anyone defending me. I don't have anything to defend myself against.

> I will repeat myself. I will not continue to participate. I refuse to participate in anything....

The district court advised Torres of her constitutional right to appointed counsel, the risks associated with self-representation and the benefits of securing legal representation. Torres confirmed that she had discussed her constitutional rights and her decision to waive counsel with her advisers:

> Torres: I will repeat myself.
>
> I don't need lawyers. I don't need Court-appointed lawyers. I don't need to hire lawyers. I have nothing, nothing to defend myself against. I'm not going to participate in your so-called trial or, you know, circus, charade, whatever you want to call it.

> The Court: Of course, it is your right to do whatever you wish in that respect.

> Torres: That is what I have chosen to do.

> The Court: You have discussed with your advisers the risks involved in that decision?

> Torres: Yes, I have.

Because Torres refused to enter a plea, the district court entered a plea of not guilty on her behalf and denied her request to be treated as a "prisoner of war," ruling that the trial would go forward.

On May 5, 1980, the district court again advised Torres of the consequences of her decision to waive her right to counsel. In particular, the district court informed Torres that, even though she did not intend to recognize the court's jurisdiction, "as a practical matter," her interest in avoiding a conviction would be better served if counsel were protecting her interests during jury selection, during the testimony of witnesses and admission of evidence, and during the government's opening and closing statements.

In light of Torres' unwillingness to participate in the proceedings, the government requested that the district court appoint counsel for Torres. The district court refused:

> The Court: ... [Torres] is an intelligent woman, based on what happened last time, and if she wants counsel she knows she can have counsel. I explained that to her last time. If she wants counsel, counsel will be appointed. She has no obligation to say anything to me, and I will not require her to say anything, but Miss Fink ... [i]t seems to me you told me that last time, that you had advised ... Torres of what her rights were.

> Ms. Fink: Yes, your honor.

> The Court: And you intend to continue doing that?

> Ms. Fink: Yes, your honor.

When asked if she would like to make a statement, Torres restated her belief that she was a "prisoner of war" and refused to recognize the court's authority.

### A. Sentencing Issues.

On May 19, 1980, prior to jury selection, the court expressed its concerns regarding the statute under which Torres would be sentenced should there be a guilty verdict.

At the time, 18 U.S.C. § 844(i) carried a maximum sentence of twenty years' imprisonment. If death resulted from the offense, however, the defendant could be sentenced to imprisonment for "any term of years," life imprisonment or the death penalty as provided by 18 U.S.C. § 34 ("Section 34"). Under Section 34, the jury had discretion to impose life imprisonment or the death penalty.[4]

The government requested that the district court impose sentence, up to a maximum of life. The court questioned its authority to impose a life sentence under Section 34 and expressed concerns on a jury-imposed life sentence without considering mitigating factors.[5] The court considered whether Torres could have knowingly and intelligently waived her right to counsel if she was unaware of who would determine her sentence. The government disagreed with the court's reading of the statute, and the resolution of these issues was deferred.

### B. Jury Selection.

When Torres entered the courtroom on May 19, 1980, she spoke Spanish to her supporters in the gallery, causing a considerable commotion. Despite the court's warning that continued disruption would require her removal from the courtroom, Torres continued to agitate the crowd in Spanish. She was temporarily removed from the courtroom until order was restored.

Although stating that he did not represent Torres in these proceedings, Michael Deutsch, Esq., one of Torres' advisers, informed the district court that he applied to the United Nations on Torres' behalf for prisoner of war status. The district court denied Deutsch's request to stay proceedings until the United Nations responded.

During the course of the district court's colloquy with Deutsch, Torres insisted on leaving the courtroom. The court ordered the marshals not to restrain Torres and informed her that she would be permitted to leave the courtroom and return whenever she wished. Torres left the courtroom followed shortly thereafter by Deutsch, and jury selection began.

The district court informed the venire pool that Torres did not wish to participate but would be able to hear the proceedings through an audio connection in an adjoining room. Prospective members of the jury were apprised that their sole function was to determine guilt or innocence, and that the judge would determine punishment. At all times, Torres and her advisers heard the discussions and proceedings, but did not participate. In addition, Torres received a transcript of each day's proceedings including bench conferences. Neither Torres nor Deutsch returned for any part of jury selection.

On May 20, 1980, after jury selection, but before trial, the district court again addressed the constitutionality of Section 34 and whether it was too late for Torres to be advised that the jury may determine her punishment. At this time the government requested a separate sentencing hearing in which Torres would be permitted to participate, with or without counsel, and present her position and mitigating evidence. The court decided it would rule on the government's request at a later date.

### The Trial

The trial began on May 20, 1980. Torres refused to cross-examine the government's witnesses or to participate. Before trial resumed on May 21, 1980, the district court again informed Torres about the issues surrounding Section 34. Torres simply reiterated her political position and demanded that she leave the courtroom. The district court

---

4. Section 34 stated in relevant part: "Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if jury shall in its discretion so direct...." In 1994, Congress amended the statute by removing the clause which gave the jury discretion. *See* Pub.L. No. 103–322, tit. VI, § 60003(a)(1), 108 Stat.1968 (1994).

5. "I don't see on what theory the jury could be empowered to direct me to impose a sentence of life imprisonment without considering any of the mitigating factors that might be available to the defendant and I know of no procedural device for permitting them to consider such mitigating factor[s]."

then appointed Arthur Viviani, Esq., as *amicus curiae* ("Amicus") to argue Torres' position regarding Section 34.

The jury was brought in, and trial resumed. Later that day, outside the presence of the jury, the district court explained that it appointed the Amicus to assist the court and not as Torres' counsel. The court asked the Amicus to inform Torres of his assignment and offer her any assistance she requested:

> The Court: ... I would just like you to argue [Torres'] position.
>
> As you may be aware, [Torres] has taken the position that she wants no part in this trial, she wants no part of it.
>
> My view, it is her constitutional right if she wants to if she wishes, and, therefore, I do not wish you to impose your help on her.
>
> However, I would appreciate it if you would just make yourself known to her and just tell her of your assignment to the extent she lets you and say you would be glad to help her in any way she wants.
>
> . . . . .
>
> I also would like you to call each of her advisers ... and tell them the same thing, that you would be glad to hear their views or give them yours.

Midday on May 22, 1980, the jury commenced deliberations. During deliberations, the district court heard arguments from the government and the Amicus regarding Section 34. The Amicus argued that Section 34 was not mandatory, but "simply an alternative position which the Judge in the first instance has to determine whether or not it goes to the jury." He concluded that

> [the court has] initial discretion as to whether or not [it will] impose the penalty. If [the court] decides that the penalty must be life ... then that must go to the jury.

After further discussions with both the Amicus and the government, the district court concluded that it had the authority to order a separate sentencing hearing, should the jury return a guilty verdict. The district court reasoned that a bifurcated proceeding would guarantee that Torres had the opportunity to present mitigating evidence to the jury. Moreover, to preserve Torres' objection to its decision, the court stated that it would set aside the jury's sentence if it found that Torres could have, given adequate opportunity, come forward with a reason why the matter should not have been submitted to the jury. In addition, the court decided to question the jurors to determine whether any were opposed to determining the sentence. If any were, he would empanel a new jury. At no time did Torres or any of her advisers participate in discussions regarding Section 34, although Torres heard the proceedings and received all pertinent court materials.

Following the jury's guilty verdict, the court explained to the jury that it would conduct a sentencing *voir dire* to determine whether they could determine Torres' sentence. Prior to questioning the individual jurors, the court again offered Torres the opportunity to participate and suggested that she face the jury "because [the jury] might very well feel less inclined to serve under such a function in the presence of a live person that they have to deal with rather than some abstract nonexistent person they have never seen." Torres declined.

The court then summarized Torres' reasons for not appearing during the sentencing *voir dire* and questioned the jurors individually. The court concluded that the jurors were qualified and empaneled the same jury to determine Torres' sentence. Torres heard the sentencing *voir dire* through the audio system.

**The Sentencing Hearing**

Before the government presented evidence, the district court brought Torres into the courtroom to be sure she understood her options. The district court verified that Torres had heard everything through the loudspeakers and told her that she would have the opportunity to address the jury personally and to present any evidence she wished during the sentencing proceeding:

> The Court: I just wanted to be sure that you understand the option that's now before you. . . .
>
> . . . . .

Torres: I have been forced to hear a lot, right.

The Court: I suppose you als[o] heard, I gave the jury my version of what your position is. I just want you to understand that without waiving any of your rights on that, you have, if you want to, the option of telling the jury in your own words what your position is. That doesn't waive any rights you have under international law or any other kind of law.

After the government offers its evidence ... I will ... ask whether you want to come in and make your statement to the jury. That's all. I just wanted to make sure that you understand that.

Of course, if you don't want to, that's your privilege.

Torres acknowledged that she understood her rights, but unequivocally declared her intention not to participate:

Torres: Yes, I know. It's not necessary for me to hear anything that the government or any part of this trial or these proceedings that have been going on because as far as I am concerned they have no relevance because I have stated my position.

My position is very clear and I am not going to alter that position no matter what this illegal Court, you know, comes up with.

. . . . .

... I am not going to take part in it.

. . . . .

The Court: I tried to state your position as best I could to the jury. You undoubtedly heard it.

Torres: It's not necessary that I state my position to anybody. Anybody having to do with these illegal proceedings because they have no say so in my position. The jury, [the prosecutor], you, or any one of these people in this room.

The Court: As a practical matter it might have in regard to the consequences. Rightfully or wrongly—

Torres: Or any consequences that come out of these proceedings will be illegal in themselves.

The Court: I understand, but the fact you might be in jail—

Torres: I am in jail. That fact hasn't changed. My coming in here and stating my position to the jury that I feel has absolutely no say so in my position is not going to change the situation.

The Court: It might affect what the jury does. As a practical matter it might make things easier.

Torres: It doesn't matter what the jury does, which is what my position states.

The Court: I just wanted you to understand that you could state your position to the jury without waiving any of the positions you have taken.

Torres: My position stands as it is unaltered.

Although the government presented evidence, Torres took no part in the sentencing hearing. At the conclusion of the evidentiary portion, the district court offered Torres an opportunity to present whatever evidence she wished, even offering an adjournment to collect evidence. Torres declined the court's offers. After the government presented its summation, the court asked Torres whether she wanted to state her position to the jury at that time or after an adjournment. Torres adhered to her position and refused to participate.

The court instructed the jury, stating that it could consider mitigating circumstances even though Torres chose to present none. After the jury returned its verdict of life imprisonment, the court moved, on Torres' behalf, to set aside both the verdict and the sentence, and offered Torres the opportunity to make a statement. Torres said she did not recognize the authority of the court and would not participate in the proceedings. The court sentenced Torres to life imprisonment.

**Post–Trial Proceedings**

On July 2, 1980, the district court considered its motion to set aside the verdict and

sentence. At the beginning of that proceeding, one of Torres' legal advisers reminded the district court that a petition had been filed with the United Nations on Torres' behalf. The adviser urged the district court to "be well aware of ... Torres' position and ... respect that [she] is an intelligent woman, ... [who] has sacrificed her life[,] and ... not ... treat her like a common criminal."

After hearing arguments, the court denied its motion to set aside the verdict and concluded that the constitutional requirements for a waiver of right to counsel were met. The court reasoned that Torres understood the risks of proceeding without counsel and was able to make an intelligent decision, noting that there was:

> ... no mistaking [Torres'] articulateness nor her ability to reason, nor her ability to understand what was going on.

> . . . . . .

> [Torres] clearly understood that she had a choice and clearly understood what advantages she could get from a lawyer if she wanted one and she clearly had the capacity to make an intelligent decision.

The court concluded that Torres' waiver of counsel remained constitutionally valid notwithstanding her initial unawareness of the jury's role in determining her sentence. Noting that her conduct throughout the proceedings was consistent with her political position, the court stated that it was satisfied that Torres would not have acted differently had she been advised at an earlier stage.

The court then informed Torres that it denied its motion to set aside the verdict, advised her of her right to appeal and told her that it would direct the clerk to file a notice of appeal on her behalf. In addition, the court apprised Torres that failure to prosecute the appeal would result in its dismissal. Consistent with her position throughout the proceedings, Torres stated:

Torres: I really don't think it's necessary for you to explain all of these things to me because you very well know that my position as a prisoner of war stands and you know it has not changed from the day that I was brought into this courtroom and it is not going to change. . . .

The Court: I understand your position and, of course, you have a right to the appointment of a lawyer on the appeal if you wish one.

The clerk of the court entered a notice of appeal on Torres' behalf; however, her appeal was dismissed for lack of prosecution. Although she became eligible for parole in 1990, Torres remains incarcerated.

## Section 2255 Motion

On July 28, 1995, fifteen years after her conviction, Torres filed a motion for post-conviction relief pursuant to 28 U.S.C. § 2255, claiming for the first time that she did not receive a fair trial. She argued that the government violated her constitutional rights under the Fifth, Sixth and Eighth Amendments. By Memorandum and Order dated November 27, 1996, the district court denied the motion in its entirety. The district court granted a certificate of appealability,[6] and we now consider Torres' appeal.

Torres challenges her conviction, arguing: (1) that her waiver of counsel violated the Sixth Amendment; (2) that she was sentenced by an uninformed jury in violation of the Due Process Clause of the Fifth Amendment because the jury was not presented with mitigating evidence; and (3) that her sentence under Section 34 violated the Eighth Amendment's proscription against cruel and unusual punishment because the statute did not identify mitigating circumstances that the jury should consider.

---

6. The Antiterrorism and Effective Death Penalty Act of 1996, § 102, Pub.L. No. 104–132, 110 Stat. at 1217, enacted April 24, 1996, requires a would-be appellant to obtain a Certificate of Appealability determining that he "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2); *accord Thye v.*

*United States,* 96 F.3d 635, 636 (2d Cir.1996) (*per curiam*). However, we recently concluded that petitioners like Torres who filed section 2255 motions before April 24, 1996 are not required to obtain a Certificate of Appealability to appeal the denial of their motions. *See United States v. Perez,* 129 F.3d 255, 260 (2d Cir.1997).

## DISCUSSION

### Sixth Amendment

Torres contends that the waiver of her right to counsel was invalid (1) because the district court failed to conduct a proper inquiry under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); (2) because she refused to participate in the proceedings; and (3) because she was unaware, until the third day of trial, that the jury would determine her sentence. We conclude that these arguments lack merit.

**Faretta *Inquiry***

 The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. There is, however, the correlative right to dispense with legal assistance and represent oneself. *See Faretta*, 422 U.S. at 818–34, 95 S.Ct. at 2532–41. Because a defendant who decides to act *pro se* relinquishes traditional benefits associated with formal legal representation, the district court must ensure that the accused made her decision "knowingly and intelligently." *Id.* at 835, 95 S.Ct. at 2541.

 Although there is no talismanic procedure to determine a valid waiver, *see United States v. Tracy*, 12 F.3d 1186, 1194 (2d Cir.1993), the district court should engage the defendant in an on-the-record discussion to ensure that she fully understands the ramifications of her decision. *See id.* at 1192. The court should consider " 'whether the defendant understood that [she] had a choice between proceeding pro se and with assigned counsel, whether [she] understood the advantages of having one trained in the law to represent [her], and whether the defendant had the capacity to make an intelligent choice.' " *United States v. Hurtado*, 47 F.3d 577, 583 (2d Cir.1995) (quoting *United States v. Calabro*, 467 F.2d 973, 985 (2d Cir.1972) (internal quotation marks and citation omitted)). In other words, the district court must be satisfied that the defendant was aware of the risks associated with self-representation and that her choice was made "with eyes open." *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. We need not analyze the district court's every word, so long as the record as a whole demonstrates that the defendant knowingly and intelligently waived her right to counsel. *See Hurtado*, 47 F.3d at 583.

Although the district court's *Faretta* inquiry could have been more thorough, we are satisfied that Torres' waiver was knowing and intelligent. At her first appearance before the district court on April 16, 1980, Torres unequivocally acknowledged her right to counsel and the risks in waiving that right. She explained that she would raise no defense, would not participate in the proceedings, and had consulted with her legal advisers. At the hearing conducted on May 5, 1980, the district court again advised Torres of her constitutional rights and of the risks of proceeding *pro se*. The court described the government's burden of proof and informed Torres about the benefits, at each stage of the proceedings, of having a lawyer devoted to her interests. Moreover, the court assured Torres that it would seek the advice of her legal advisers, and her advisers assured the court that they would advise Torres of possible legal defenses.

After reviewing the record, we are satisfied that over the course of these two proceedings, the district court established that Torres understood her rights, knew her options, was aware of the risks and voluntarily waived her right to counsel.

***Refusal to Participate***

 Torres contends that "[a]llowing [her] to proceed without counsel in the face of her stated intention to withdraw from the proceedings" violated her Sixth Amendment right to counsel. She maintains that a decision to proceed *pro se* is inconsistent with her decision not to participate, and that, therefore, the district court should have appointed counsel on her behalf. These arguments are unavailing.

 We recognize that a defendant's decision not to participate in the proceedings may cast doubt on whether her waiver was knowing and intelligent. *See, e.g., Montilla v. INS*, 926 F.2d 162, 170 (2d Cir.1991) (waiver of counsel may not be inferred solely from defendant's silence); *United States v. Allen,*

895 F.2d 1577, 1578–79 (10th Cir.1990) (defendant's rejection of appointed counsel, failure to retain counsel, non-participation at trial, and failure to present a defense was invalid in light of court's failure to determine whether his waiver was knowing or intelligent). But a court need not inquire into the defendant's knowledge of the law, whether she will testify in her own defense, or how or why she will conduct her defense. *See Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540–41; *United States ex. rel. Maldonado v. Denno,* 348 F.2d 12, 15 (2d Cir.1965). At least unless the defendant's action results in a non-adversarial proceeding, a court's *Faretta* inquiry should only focus on whether the defendant "has the requisite capacity to understand and sufficient knowledge to make a rational choice." *Tracy,* 12 F.3d at 1192.

▆▆▆▆ Furthermore, once a defendant has knowingly and intelligently waived her right to counsel, a district court should not interfere with the defendant's choice, even though it "may sometimes seem woefully foolish to the judge." *United States v. Curcio,* 694 F.2d 14, 25 (2d Cir.1982). Just as district courts should not "compel a defendant to accept a lawyer [she] does not want," *Faretta,* 422 U.S. at 833, 95 S.Ct. at 2540, they should not interfere with the defendant's chosen method of defense. There is no dispute that district courts must make a defendant "aware of the dangers and disadvantages of self-representation," *id.* at 835, 95 S.Ct. at 2541, and should inform the defendant that she will be "required to follow all the 'ground rules' of trial procedure," *id.* at 836, 95 S.Ct. at 2541. However, courts must remember that the Sixth Amendment right to waive counsel, like all procedural protections for a criminal defendant, stems in part from the sanctity of freedom of choice. *Id.* at 834 n. 45, 95 S.Ct. at 2540 n. 45.

Torres today contends that in her case, her non-participation meant that she presented *no* defense (as opposed to merely a "suicidal" or "foolish" one). *Johnstone v. Kelly,* 633 F.Supp. 1245, 1248 (S.D.N.Y.), *rev'd on other grounds,* 808 F.2d 214 (2d Cir.1986). Further, she argues that the Constitution would not be able to countenance conviction entered pursuant to a non-adver-

sarial proceeding. *See Penson v. Ohio,* 488 U.S. 75, 84, 109 S.Ct. 346, 352, 102 L.Ed.2d 300 (1988) ("The paramount importance of vigorous representation follows from the nature of our adversarial system of justice. This system is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the questions.") (internal quotation marks and citation omitted). We need not reach that question, for Torres' protestations that her trial was non-adversarial are unconvincing. By not participating in her trial, she was clearly trying not only to challenge the jurisdiction of the court, but also to incur political sympathy for her position. Indeed, she might well have been trying to influence the disposition of her petition to the United Nations that she be tried before an International Tribunal. And as Judge Knapp himself observed on Torres' unusual defense strategy,

> [Were I her defense counsel] I'm not at all sure that I wouldn't give her advice to do exactly what she has done in this situation. It is rather unorthodox, but I am not at all certain what the best tactics she could have adopted purely from the point of view of the chance of there being a reasonable doubt in one of the juror's minds would be. . . .

Under the circumstances, we cannot say that Torres' trial tactics—which included leading courtroom demonstrations of political supporters in the gallery—meant that she was truly the subject of a non-adversarial trial in which she presented no defense.

▆▆▆ We have concluded that Torres' decision not to participate in the proceedings did not undermine her knowing and intelligent waiver. Indeed, it is clear that she exercised her right to defend herself so that she could further her political objectives as a Puerto Rican freedom fighter. Torres verbalized her political position to the district court while admitting she knew the risks involved. Throughout the proceedings, Torres spoke frequently, often restating her political beliefs. She never deviated from her stated course of conduct despite repeated invitations by the district court to change her mind. Torres' well-articulated choice to rep-

resent herself guaranteed that she would maintain control over her defense. Even though "[a] district court is not obligated to accept every defendant's invocation of the right to self-representation," *United States v. Purnett*, 910 F.2d 51, 55 (2d Cir.1990); *see also, e.g., Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46 ("[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct [even over objection by the accused]."), in the case before us, the district court properly respected Torres' decision and her right to choose that course. *See id.* at 834, 95 S.Ct. at 2541 (although a defendant may conduct her defense to her "own detriment, [her] choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'") (quoting *Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064–65, 25 L.Ed.2d 353 (1970) (Brennan, *J.*, concurring)); *see also Denno*, 348 F.2d at 15 (observing that "even in cases where the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner").

In sum, the district court acted properly by not questioning Torres' reasons for choosing to proceed *pro se.* Her fully informed, politically motivated choice was an appropriate exercise of her constitutional rights.

### *Sentencing Procedure*

 Finally, Torres argues that her waiver was not knowing and intelligent because, at the time of her waiver, she was unaware of the sentencing procedure that would be used by the district court. Although Torres was listening to the proceedings when the dispute pertaining to whether the judge or the jury would determine her sentence first arose, she argues that the district court's decision on the third day of trial to allow the jury to determine her sentence invalidated her waiver.

Torres relies on the district court's words prior to jury selection:

> It is perfectly clear to me that [Torres] could not intelligently waive the right to a

counsel if the jury is to have anything to do with her sentence.

and at sentencing:

> ... what troubles me primarily at this time ... is whether [Torres] had a meaningful opportunity to waive her right to counsel [without notice of the possibility that the jury would determine the sentence after a second hearing.]

Torres contends that the district court found her waiver to be invalid and then wrongfully rejected this purported error as harmless, ignoring opinions which declare that an invalid waiver cannot be harmless error. *See, e.g., Johnstone v. Kelly*, 808 F.2d 214, 218–19 (2d Cir.1986). We need not directly address her contention because we find that her waiver was valid.

 It is well-established that a waiver of counsel may be invalid if the district court fails to inform a defendant of the nature of the charges, the range of allowable punishments, and the risks of self-representation. *See Von Moltke v. Gillies*, 332 U.S. 708, 724, 68 S.Ct. 316, 323–24, 92 L.Ed. 309 (1948); *United States v. Balough*, 820 F.2d 1485, 1487 (9th Cir.1987); *see also United States v. Moskovits*, 86 F.3d 1303, 1306 (3d Cir.1996) (invalidating a waiver because the district court did not inform the *pro se* defendant of "the range of punishments he faced on retrial"). Although there may be situations not stated in *Von Moltke* and its progeny in which a waiver may be invalid, not every omission by the district court during a *Faretta* inquiry will invalidate an otherwise knowing and intelligent waiver.

Recently, in *Johnson v. Schmidt*, 83 F.3d 37 (2d Cir.1996), we considered a novel situation in which we concluded that a *pro se* litigant was not fully informed; however, Torres' reliance on *Johnson* is misplaced. In *Johnson* we held that "the same jury may not be used for two unrelated cases brought by a *pro se* litigant unless fully informed consent is given." *Id.* at 39. *Johnson* differs from this case because there the district court failed to instruct Johnson about the risks of having the same jury hear two separate cases. We were concerned that Johnson had forfeited "important rights because of [his] lack of legal training." *Id.* at 39 (quot-

404

ing *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). A further problem was that the district court in *Johnson* failed to explain to Johnson certain hazards about his chosen course even after one of those hazards became a reality. We explained that once "a witness at the first trial volunteered ... prejudicial testimony that Johnson was involved in a 'cop shooting[,]' ... the District Judge ... should have aborted his novel procedure ...." *Id.* at 40.

By contrast to the district court in *Johnson,* the district court here fully advised Torres of the risks associated with proceeding *pro se.* The dispute regarding whether the judge or the jury would determine her sentence under Section 34 raised a legal issue over which she did not have a choice, unlike in *Johnson.* Finally, Torres was aware of the dispute as soon as it arose, and the district court appointed an Amicus to address Torres' position with respect to the dispute.

 In sum, under the facts of this case, the district court's failure during the *Faretta* hearing to advise Torres whether the judge or the jury would determine her sentence did not invalidate her otherwise knowing and intelligent waiver. Although omissions relating to the nature of the charges, the offenses included with them and the range of allowable punishments may invalidate a waiver, other omissions must be viewed by examining the totality of the record, by determining whether the district court informed the *pro se* litigant when the issue arose and by determining whether the district court informed her of subsequent risks. *See Johnson,* 83 F.3d at 39–40.

Therefore, because on the facts of this case, there was no "defect" to her waiver of counsel, even with respect to the post-waiver sentencing procedure, Torres' argument that the district court violated well-settled law by applying a harmless error analysis to the allegedly defective waiver, *see, e.g., United States v. Dawes,* 895 F.2d 1581, 1582 (10th Cir.1990); *Johnstone,* 808 F.2d at 218–19, is inapposite.

## Fifth Amendment

 Torres next asserts that, because the jury was not presented with any mitigat-

ing evidence, she was sentenced by an uninformed jury in violation of her due process rights. We disagree with Torres' characterization of what occurred.

 There is no doubt that the sentencing procedure is subject to due process rights; however, these rights are not as extensive as Torres asserts. Due process requires (1) that a defendant not be sentenced based on materially false information, *see Townsend v. Burke,* 334 U.S. 736, 740–41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); (2) that a defendant be given notice and an opportunity to contest the facts upon which the sentencing authority relies in imposing the sentence, *see id.* at 741, 68 S.Ct. at 1255; and (3) that a defendant not be sentenced based on a material misapprehension of fact, *see United States v. McDavid,* 41 F.3d 841, 843–44 (2d Cir.1995). Torres, however, has not demonstrated any of these violations.

Furthermore, Torres relies on cases which articulate no rights beyond those discussed above. In *United States v. Doe,* 655 F.2d 920, 927–29 (9th Cir.1981), the court remanded the case for a new sentencing hearing because the district court precluded the government from presenting evidence which may have clarified the extent of the defendant's cooperation. Similarly, in *United States v. Malcolm,* 432 F.2d 809 (2d Cir. 1970), we held that a "combination of procedural irregularities, confusion, misunderstanding and misinformation in the sentencing process here requires reversal." *Id.* at 819. Although we have observed that an important function of the prosecutor is to ensure that "all information in his possession material to punishment and favorable to the accused is presented to the court and that the sentence is not based upon mistakes of fact or faulty information," *id.* at 818, the context of that observation is of paramount importance. In *Malcolm,* there was material mitigating evidence that actually existed at the time of sentencing, but which the district court precluded both the government and the defense from introducing before sentence was passed. In those circumstances, the exclusion of "information highly material to mitigation of punishment" at the sentencing

hearing constituted a fundamental violation of due process. *Id.* at 819. The present case is entirely different.

 Torres' claim cannot be construed as alleging trial-court impropriety, denial of a fair opportunity to respond to the government's evidence at sentencing, or as a material misapprehension of fact. Rather, it must be seen as an attempt to read *Malcolm* as providing a right to have all material mitigating evidence presented at the sentencing hearing, and thus imposing an affirmative duty on the government to present such evidence. We doubt *Malcolm* intended to provide such a right or impose such a duty, but we need not reach that question because in this case, there was no material mitigating evidence of which the prosecution was aware that it did not bring to the sentencing court's attention.[7]

In sum, the lack of any confusion, misunderstanding or misinformation in the sentencing process, *see Malcolm*, 432 F.2d at 819, Torres' repeated refusal to participate in the sentencing hearing, coupled with the complete lack of mitigating evidence that existed at the time of her trial, lead us to conclude that Torres' due process rights were not violated.

### Eighth Amendment

 Finally, Torres contends that her sentencing under 18 U.S.C. § 34 violated the Eighth Amendment because the statute did not identify the aggravating and mitigating circumstances to be considered in determining whether to impose a life sentence. This argument lacks merit.

 The Supreme Court has integrated the Eighth Amendment's proscription against cruel and unusual punishment into our death penalty jurisprudence through two separate doctrines: (1) the guided discretion doctrine, first enunciated in various of the opinions of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (*per curiam* ); and (2) the individualized consideration doctrine, established in *Woodson v. North Carolina*, 428 U.S. 280, 303–05, 96 S.Ct. 2978, 2990–92, 49 L.Ed.2d 944 (1976) (plurality opinion). More relevant here is the guided discretion doctrine, which requires sentencing statutes to identify aggravating and mitigating circumstances that a jury should consider before imposing the death penalty. Torres seeks to extend this doctrine to non-capital cases.

At least two courts of appeals have declined to extend the guided discretion doctrine to non-capital cases, and the Supreme Court has declined to extend the individualized consideration doctrine to such cases. The Fourth and Eighth Circuits have upheld the constitutionality of state statutes that permit the imposition of a life sentence without providing any standards for guiding the jury's sentencing discretion. *See Vines v. Muncy*, 553 F.2d 342, 346–49 (4th Cir.1977) (Virginia); *Britton v. Rogers*, 631 F.2d 572, 578–81 (8th Cir.1980) (Arkansas). Although Torres argues that the courts' opinions in these cases were driven primarily by federalism concerns, we find that they comport with the Supreme Court's consistent distinction between capital and non-capital cases.

In *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court held that imposition of a life sentence without possibility of parole, in the absence of consideration of mitigating factors, did not constitute cruel and unusual punishment in violation of the Eighth Amendment. Although the Court noted that a "required mitigation" claim finds support in death-penalty jurisprudence, it categorically refused to extend the individualized consideration doctrine to non-capital sentences:

> [o]ur cases creating and clarifying the "individualized capital sentencing doctrine"

---

7. There has now come to light evidence of a highly abusive family situation and psychological factors that call the defendant's control over her criminal behavior into question. These individual circumstances, which have come to light only after many years, may give rise to relief through a petition to Torres' parole board; they do not suffice for a collateral attack on her sentencing.

In this respect, we note that Judge Knapp wrote favorably to the parole board, stating that "it would seem clear that further confinement would serve no useful purpose. Considering its probable effect on the inmate, it would seem counterproductive to—and perhaps wholly destructive of—the progress thus far achieved by the Bureau."

have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties.

*Id.* at 995, 111 S.Ct. at 2702.

The Supreme Court has drawn "the line of required individualized sentencing at *capital cases.*" *Id.* at 996, 111 S.Ct. at 2702 (emphasis added). Because we see no reason in this case to extend that line, we reject Torres' Eighth Amendment argument.

We have examined the remaining contentions and find them to be without merit.

## CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Torres' petition to vacate her conviction and sentence pursuant to 28 U.S.C. § 2255.