06-5340-pr
Clark v. Perez

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: February 26, 2007    Decided: January 3, 2008)

Docket No. 06-5340-pr

- - - - - - - - - - - - - - - - - - - - -X

JUDITH CLARK,

Petitioner-Appellee,

- v.-

ADA PEREZ, Superintendent, Bedford
Hills Correctional Facility, ANDREW
CUOMO,* Attorney General, State of New
York,

Respondents-Appellants.

- - - - - - - - - - - - - - - - - - - - -X

Before:   JACOBS, Chief Judge, LEVAL, and SOTOMAYOR,
          Circuit Judges.

Respondents appeal from a judgment of the United States

District Court for the Southern District of New York

(Scheindlin, J.), granting Petitioner-Appellee's petition

---

* Pursuant to Federal Rule of Appellate Procedure
43(c)(2), New York Attorney General Andrew Cuomo is
substituted for his predecessor, Eliot Spitzer.

for a writ of habeas corpus.  The district court held that Clark's failure to take any direct appeal from her conviction constituted an inadequate state procedural default; reaching the merits, it held that the trial judge violated Clark's Sixth Amendment rights.  We reverse.

LAWRENCE LEDERMAN, Milbank, Tweed, Hadley & McCloy, New York, NY, and LEON FRIEDMAN, New York, NY, for Petitioner-Appellee.

MICHAEL E. BONGIORNO, District Attorney, Rockland County (Ann C. Sullivan, Special Assistant District Attorney, on the brief), New City, NY, for Respondents-Appellants.

DENNIS JACOBS, Chief Judge:

Respondent officials of the State of New York (the "State"), appeal from the 2006 grant by the United States District Court for the Southern District of New York (Scheindlin, J.) of Judith Clark's petition for a writ of habeas corpus, which challenged a 1983 judgment of the New York Orange County Court convicting Clark of three counts of Murder in the Second Degree under New York Penal Law § 125.25, six counts of Robbery in the First Degree under New York Penal Law § 160.15, and other lesser crimes.  At her criminal trial, the trial court permitted Clark to defend herself pro se after an inquiry into whether her

2

election to do so was competent, knowing and intelligent; but in an act of political protest, Clark and her co-defendants absented themselves from the courtroom through nearly all of the pre-trial proceedings and the trial itself, listening to the proceedings through a speaker in their holding cells. Clark never filed a direct appeal in state court. The district court ruled that Clark's failure to appeal her convictions under the circumstances was an inadequate state procedural bar to federal review, and that the trial court violated Clark's Sixth Amendment right to counsel by allowing her trial to proceed without either appointing stand-by counsel or terminating Clark's pro se representation altogether.

First, we hold that Clark's failure to timely appeal her conviction was an adequate state procedural bar foreclosing federal review of the merits of her Sixth Amendment claim absent a showing of cause and prejudice, and there was no prejudice. Second, we hold that Clark's Sixth Amendment claim is without substantive merit. If Clark was without certain protections guaranteed by the Constitution, that was because she knowingly and intelligently exercised her constitutional right to make those choices. The

3

district court's ruling on the merits conflicts with this Court's holding in Torres v. United States, 140 F.3d 392 (2d Cir. 1998), and with the Supreme Court's holding in McKaskle v. Wiggins, 465 U.S. 168 (1984).

The judgment of the district court is reversed.

**BACKGROUND**

The facts of this case are set forth more fully in the district court opinion. Clark v. Perez, 450 F. Supp. 2d 396, 402-13 (S.D.N.Y. 2006).

**A**

At the time of the underlying offenses, Petitioner-Appellee Judith Clark was a member of a radical leftist revolutionary group calling itself the Weather Underground. On October 20, 1981, a group of heavily armed men--some or all of whom were members of the Black Liberation Army revolutionary organization--robbed an armored truck in Nyack, New York. In a surprise assault, they shot two security guards, killing one and severely wounding the other. The robbers also shot and killed two policemen who

4

attempted to stop the getaway vehicles on the highway. Clark was a driver of one of the getaway vehicles; she and two of her co-conspirators were captured after she crashed. In the moments before her capture, police saw Clark reach for a nine-millimeter pistol on the floor of the car. This appeal focuses not on the details of Clark's involvement in the robbery but on the events at her trial in 1983 alongside co-defendants Kuwasi Balagoon and David Gilbert.

**B**

At a pretrial conference on June 2, 1983, Judge Ritter of the Orange County Court considered applications to appear pro se made by Clark, Balagoon and Gilbert. At the outset of the hearing, the three, who were then represented by counsel, protested that their supporters in the audience had been assaulted and arrested by security personnel, and announced to the court that they would proceed no further until their supporters were freed and brought back into the courtroom. The judge asked the defendants to proceed with the hearing and conform themselves to rules of courtroom

decorum.  Clark and the others refused and were escorted from the courtroom, as a contingent in the audience rose, chanted slogans, and marched out, accompanied by the defendants' lawyers (who had no permission from the court to leave).

Later that day, the defendants returned to the courtroom for the purpose of pressing their applications to defend themselves pro se.  The court instructed Clark that she would be allowed to remain in the courtroom only if she observed rules of courtroom decorum and agreed to refrain from disrupting the proceedings.  Clark's response was equivocal:

> We have conducted ourselves and we continue to
> conduct ourselves with all the respect that
> revolutionaries and freedom fighters will always
> conduct themselves, respect for ourselves. . . .
> I have no reason to be disruptive in this
> situation.  My purpose to be here at all was to
> fight for my right to represent myself because I
> am a freedom fighter. . . . Because I am the only
> one who can speak for myself. . . . I am very much
> hoping that the Court does not create a
> provocative situation and unprovoked, I have no
> intention of disrupting the situation.

The judge warned the defendants about the perils of

self-representation by a layman, and told them that he considered it unwise for them to conduct their own defense in so complicated a case. He reminded them that their decision to represent themselves would in no way relieve them from the obligation to observe decorum, and warned them that if he was forced to remove them from the courtroom, they would have no representation whatsoever.

Turning to Clark, the trial judge asked whether she understood the implications of her decision, whether she suffered from any mental or physical impairments that would make it difficult for her to understand the proceedings, and whether she had reflected upon her decision. Clark asserted: "I wish to represent myself because as a freedom fighter I am the only one who can speak for myself and I can definitely not be represented by an officer of the court." Clark's then-attorney, Susan Tipograph, offered her opinion that Clark was fully competent to make the decision to represent herself pro se.

C

After Clark was no longer represented by Tipograph, the court granted Clark's request to retain Tipograph as a legal advisor. Ultimately, both Tipograph and Balagoon's former counsel, Judith Holmes, acted as legal advisors to all three defendants (the co-defendants having waived any potential conflicts).

At voir dire, the defendants protested the limitations on their opportunity to confer with each other and their legal advisors about their collective strategy. Clark announced to the judge on the first day of jury selection (July 20, 1983) that she and her co-defendants would not attend voir dire unless they could meet regularly. The judge told Clark that they had an absolute right to be present at all stages of their trial, but that they could waive that right by refusing to attend. On the second day of voir dire, they showed up only briefly to protest the lack of arrangements for defendants' meetings; they were removed from the courtroom. They attended court on the

third day.[1]  The following day, they left early, protesting the anonymity of the juror panel and the judge's restrictions on the defendants' questioning of prospective jurors, much of which focused on the jurors' knowledge of "New Afrika" and other leftist revolutionary doctrine.  The defendants refused to attend the remaining seven days of voir dire.

When they absented themselves, the defendants were able to listen to proceedings over a speaker in their holding cells, and every morning the judge announced on the record that the defendants had elected to absent themselves, but could return whenever they wished.

## D

Balagoon's opening statement focused on political

---

[1] At one point on the third day of voir dire, in Clark's presence, legal advisor Judith Holmes sought to make an argument to the court about the circumstances under which the legal meetings were being conducted.  Pursuant to the defendants' decision to represent themselves pro se, the judge did not permit Holmes to speak on the defendants' behalf, telling her that her role as a legal advisor was to offer advice and not act as an advocate or spokesperson.

ideology, his background as a revolutionary, and his belief that the United States was a fascist and racist nation. After multiple objections from the prosecution, the trial judge ordered Balagoon to confine his comments to what would be proven at trial; Balagoon left in protest. Clark and Gilbert announced they were likewise unwilling to continue. Clark explained her decision to leave in the presence of the jury:

> Number one, I am an anti-imperialist freedom fighter. I don't recognize the legitimacy of this Court. Second of all, I am not going to continue here just as though everything was just proper when what's obvious is obvious, which is, that the truth about the question of New Afrika is not allowed to be spoken in this courtroom.

The trial judge advised the defendants (outside the jury's presence) that he would allow them to withdraw and listen in from their holding cells because that was their choice to make, but that they could come back whenever they chose, provided that they would observe the rules of the court.

The prosecution put on its case in the defendants' absence; the defense table was empty throughout the

prosecution's case and no objections were interposed by the defense.  At the start of each day, the trial judge made a record that the defendants were electing to stay away, that they could return when they wished, that the speakers were activated, and that the defendants could inform the judge anytime they wished to return.

On two occasions, the defendants entered the courtroom (with their legal advisors), seeking prisoner-of-war status, the production of incarcerated witnesses who were "New Afrikan prisoners of war," and (presumably in the alternative) change of venue "to a friendly country." Relief was denied, except that the government was ordered to produce incarcerated Black Liberation Army member Sekou Ondinga to testify for the defense.  With legal advisors present, Balagoon conducted a direct examination of Ondinga, which concerned the notion of New Afrika, the history of slavery in the United States, Ondinga's work as a "freedom fighter" with the Black Liberation Army, torture he suffered at the hands of American police, and his contention that he was a prisoner of war.  Clark herself asked Ondinga a single

11

question, relating to what responsibilities white Americans had to assist New Afrikans in their freedom fight. The defense called no other witness.

Clark's ten-page summation was a revolutionary political statement. Among other things, Clark told jurors that she wished to make

> [j]ust a few remarks about what has happened during this trial to give you a different p[er]spective . . . on what has gone on here. And while the p[er]spective represented by the Judge and D.A. is one that holds power and therefore determines what happens here, we are struggling to bring to light a radically different p[er]spective on the facts and fictions presented here. Perhaps it will not change your minds, those of you who sit in the jury box, but perhaps it will shed new light on some[]things now as well. . . . One way that it was apparent was by our absence because we did not want to lend credence to this ritual, because this Court is a tool of imperialist rule. It is not here to protect the interests of working people, but to protect the property rights in control by the rich and to repress oppressed peoples and dissidents when they rise up. . . . The D.A. calls what happened on October 20, 1981, a robbery and murder. We say it was an attempted expropriation because revolutionary forces must take from the powers that be to build their capabilities to struggle against this system. . . . The D.A. says this isn't a political case. We say and I contend that political considerations have determined the actions of the State just as much as they have

12

determined our conduct during this trial. . . . Revolutionary violence is necessary and it is a liberating force. . . . Soon this charade they call a trial will be done.  The Judge will charge and tell you to do your duty as a juror as they tell you as marines in Lebanon to do their duty.

The defendants declined to submit jury charges. Defendant Gilbert explained that, as they "consider[ed] the proceedings illegitimate," they had "no interest about getting into arguments with you about how you charge the jury, as you would do in your own purposes in any case." The jury returned a guilty verdict on September 14, 1983.

At the sentencing, Clark and her co-defendants left the courtroom before the court pronounced the sentences; the court instructed the clerk to inform the defendants of their right to direct appeal.

Clark, however, never took one.

## E

In December 2002, nineteen years later, Clark moved to vacate her convictions under New York Criminal Procedure Law section 440.10.  Her motion recited regret for her actions

and repudiated the choices she had made as a younger woman. Statements from psychologists advanced the argument that for years, she had been incapable of taking the necessary steps to appeal her case due to her initial depression in confinement, as well as her psychological inability to let go of her revolutionary belief system and to defy the expectations of her associates.

As to the merits, Clark argued that the trial judge had violated her constitutional rights by (1) allowing her to appear pro se notwithstanding her obvious unwillingness to obey the court's rules, (2) failing to appoint stand-by counsel once it became obvious that she would need to be removed from the courtroom, and (3) allowing the proceedings to continue when no one was left in the courtroom to represent her.

Rockland County Supreme Court denied her motion in September 2003. The court explained that the trial judge acted properly in accepting Clark's valid decision to represent herself and her voluntary decision to absent herself from trial, and had done everything that the

14

Constitution required by assuring that Clark (1) had access to legal advisors, (2) could listen to the proceedings, and (3) could return to the court whenever she wished. The state court added: "[W]ere the court to consider defendant's claim of a deprivation of her constitutional right, it would find the claim completely meritless."

At the same time, the court made clear that it was denying Clark's motion to vacate because she had unjustifiably failed to raise the issue on appeal--a failure that mandated denial of the motion to vacate under New York Criminal Procedure Law section 440.10(2)(c) because her claim was based on facts contained in the trial record. The court rejected the notion that the petitioner's psychological inability to retreat from her political belief system was a valid justification for her failure to take an appeal.

Clark's motion for leave to appeal in the New York Appellate Division was summarily denied on January 20, 2004.

Clark filed a habeas petition in the United States District Court for the Southern District of New York on

15

January 20, 2005, which was granted by Judge Scheindlin on September 22, 2006. See Clark, 450 F. Supp. 2d 396. This appeal followed. We discuss the district court's various rulings as they become relevant in the course of this opinion.

**DISCUSSION**

The grant or denial of habeas corpus is reviewed de novo, and the underlying findings of fact are reviewed for clear error. Jackson v. Edwards, 404 F.3d 612, 618 (2d Cir. 2005).

The State challenges the district court's decision on the grounds that (1) even though the State failed to raise as a defense the statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1), the district court should have dismissed the petition as untimely, either sua sponte or by the granting of the State's motion for leave to amend; (2) Clark's failure to take a timely appeal constituted an adequate and independent state procedural bar to post-

16

conviction relief under New York Criminal Procedure Law section 440.10(2)(c); (3) as a matter of federal law, Clark failed to exhaust the available remedies by raising her claim in a timely appeal; (4) AEDPA deference should have been afforded because the state courts denied Clark relief on the merits; (5) the petition was barred by laches; and (6) the trial court did not violate Clark's Sixth Amendment right to counsel.

We sustain the State's appeal because the district court erred in holding that Clark's failure to appeal constituted an inadequate state procedural default. Moreover, it appears that, on remand, the district court would excuse Clark's procedural default under a theory of cause and prejudice, and so we reach the merits. Clark's Sixth Amendment claim is defeated by Torres v. United States, 140 F.3d 392 (2d Cir. 1998). A criminal defendant who has competently invoked the right to appear pro se may mount a defense consisting of nothing more than a protest against the court's legitimacy and a refusal to attend trial, and has no Sixth Amendment right to be protected from

17

the prejudice that may result.[2]

# I

The district court held that:

> Given the lack of representation in the courtroom during critical portions of petitioner's criminal trial, . . . the application of [New York's requirement that issues arising from the face of the record be raised on direct appeal] was not demanded in these particular circumstances and is not adequate to prevent federal habeas review.

Clark, 450 F. Supp. 2d at 428. The court thus cast the claim in terms of ineffective assistance of counsel, reasoning that New York courts do not apply the procedural bar regularly to ineffective assistance claims, which often depend on extrinsic evidence and therefore must be brought through collateral attack rather than by direct appeal.

That, however, is not the case here. Direct appeal was available to Clark because her claim is based on facts visible on the face of the trial record. Indeed, Clark's chief justification for failing to appeal was her continued

---

[2] Because we hold that the district court erred on the above-described grounds, we find it unnecessary to reach the State's additional challenges.

18

boycott of the judicial system--not the need for extrinsic evidence. Under these circumstances, the state court's application of the requirement that claims be raised on direct appeal can hardly be described as "exorbitant." Lee v. Kemna, 534 U.S. 362, 376 (2002). It was therefore error to hold that the state procedural rule was not "adequate" to bar federal review of Clark's petition.

**A**

Ordinarily, a federal habeas court may not reach the merits if the state court's rejection of a federal claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991).[3] State procedural default also bears on the federal exhaustion requirement for habeas petitions. See 28 U.S.C. § 2254 (b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the

---

[3] The parties do not dispute that section 440.10(2)(c) was an independent state bar to review of the merits. The issue is solely its adequacy under the circumstances.

applicant has exhausted the remedies available in the courts of the State."). Specifically, when a "petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," the federal habeas court should consider the claim to be procedurally defaulted. Coleman, 501 U.S. at 735 n.1. We have thus applied New York's procedural default rules in the first instance, pursuant to the exhaustion requirement for federal habeas. See, e.g., Jimenez v. Walker, 458 F.3d 130, 148-49 (2d Cir. 2006); St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004) (per curiam); Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003). Section 440.10(2)(c) is one of the procedural default rules we so apply.

To determine whether a state procedural bar is "adequate to support the judgment," Coleman, 501 U.S. at 729, a federal habeas court should look to whether "the state rule at issue . . . is firmly established and regularly followed." Garvey v. Duncan, 485 F.3d 709, 714

20

(2d Cir. 2007). This inquiry focuses on whether the case before the court fits within the limited category of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question," Lee, 534 U.S. at 376. See also Garvey, 485 F.3d at 718; Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006).

We look to several "guideposts" in measuring "the state interest in a procedural rule against the circumstances of a particular case." Lee, 534 U.S. at 386-87. Those guideposts, or Cotto factors, are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (citing Lee, 534 U.S. at 381-85).

These considerations are obviously rooted in the

21

context of procedural defaults at trial, and are so formulated. See id. at 240-42 (concerning a failure to preserve an issue for review through a contemporaneous objection at trial); Lee, 534 U.S. at 381-85 (concerning denial of a trial continuance where petitioner ignored the applicable state procedural rule). The trial record has little or no bearing when the procedural bar arises after trial, as when no appeal is taken. Nevertheless, in at least one case, we consulted the Cotto factors in reviewing a state court's decision that rejected a federal claim on collateral review because it was not raised on direct appeal. See Murden v. Artuz, 497 F.3d 178, 192-93 (2d Cir. 2007). But the Cotto factors are not a three-prong test: they are guideposts to aid inquiry, see Monroe v. Kuhlman, 433 F.3d 236, 242 (2d Cir. 2006); so there is no need to force square pegs into round holes. Here, only the second of the Cotto guideposts is germane to a state court's denial of collateral review on the basis that a petitioner failed to file any direct appeal whatsoever.[4]

_____

[4] The first guidepost has no bearing here because the failure altogether to raise an issue cannot be "actually

22

**B**

The second Cotto factor considers whether state case law indicates that compliance with a procedural rule was required under the specific circumstances of the case. Of course, state courts will usually be best positioned to answer this question; but our independent review of state case law is needed to ensure that the application of a state procedural rule to bar federal review of the merits in a particular case is not "an arid ritual that would further no

relied on" because no court has been notified that the issue even exists. The district court analysis focused on the state court that decided Clark's motion to vacate. See Clark, 450 F. Supp. 2d at 426. But that decision is irrelevant to the first Cotto guidepost, which looks to the decision of the judge before whom the procedural violation occurred, not the decision of the last state court to deny relief because of an earlier procedural default.

As to the third guidepost, the district court reasoned that what it perceived to be a constitutional violation impacted the "realities of trial" to such a degree that Clark's failure to appeal constituted substantial compliance with state procedural rules. Clark, 450 F. Supp. 2d at 428 (quoting Cotto, 331 F.3d at 240). This was erroneous because Clark's failure to file any appeal constituted total noncompliance with the requirement that issues arising from the face of the trial record be raised by direct appeal. By definition, total noncompliance cannot also be "substantial compliance."

23

perceivable state interest." <u>Richardson v. Greene</u>, 497 F.3d 212, 218 (2d Cir. 2007) (internal quotation marks and formatting omitted).

New York law provides that a notice of appeal from a conviction must be filed within thirty days of judgment, N.Y. Crim. Proc. Law § 460, and that a motion to vacate based on facts visible on the trial record must be dismissed where the defendant unjustifiably failed to raise the issue on direct appeal. N.Y. Crim. Proc. Law. § 440.10(2)(c) (the text is in the margin).[5] The state court applied section 440.10(2)(c) to Clark's motion to vacate, determining that her failure to raise her Sixth Amendment claim on direct appeal was unjustifiable because the facts relevant to that

---

[5] N.Y. Crim. Proc. Law. § 440.10(2)(c) provides in relevant part:

> the court must deny a motion to vacate a judgment when: . . . Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him . . . .

24

claim appeared on the face of the trial record.

The district court concluded that the state court's application of section 440.10(2)(c) was not "adequate to support the judgment" against Clark because Clark's failure to appeal was not "unjustifiable." Coleman, 501 U.S. at 729. The district court observed that New York State courts deem justified the failure to raise ineffective assistance of appellate counsel on direct appeal, and reasoned that this justification exists a fortiori "where defendant had no trial counsel at all combined with an obvious unwillingness to represent herself in accordance with court rules and procedures." Clark, 450 F. Supp. 2d at 427. To support this idea, the district court cited two aged New York cases and one statutory provision. In People v. Howard, 12 N.Y.2d 65 (1962), the New York Court of Appeals noted in dicta that where a defendant has "actually" been deprived of the right to counsel at trial, the failure to take an appeal would not bar the grant of coram nobis because "the defendant's right to appeal may be less than real if counsel is not at hand to advise him of that right or to take the necessary steps to

25

perfect and prosecute the appeal." Id. at 67. Here, Clark does not claim that she misunderstood her right to appeal, or that legal advisors were unavailable to her--and in any event, a lawyer cannot force a client to appeal, even if Clark were open to suggestions and advice. In People v. Silverman, 3 N.Y.2d 200 (1957), a hearing on a petition for coram nobis was granted where a lawyer was forced on an unwilling client, an issue that the defendant did not raise on appeal. Silverman does not support the inadequacy determination here for two reasons: Silverman's claim was not based solely on matters appearing in the trial record; and Silverman was represented on his direct appeal by the same lawyers forced on him at trial.

The district court also relied on New York Criminal Procedure Law, reasoning that, because section 440.10 was designed to incorporate the common law writ of coram nobis, and because section 440.10(3)(a) and coram nobis case law make particular exceptions to procedural default where a claim is based on a deprivation of the right to counsel, the link between coram nobis and section 440.10 "could also be

26

relevant" to the requirement that a timely appeal be taken where a claim appears on the face of the record. Clark, 450 F. Supp. 2d at 427-28 n.218. Section 440.10(3)(a) says what happens when the reason a ground for appeal does not appear on the face of the trial record is the defendant's failure to make the record, and provides that denial of the writ on that basis is impermissible where the claim is based on a deprivation of the right to counsel. This provision is categorically irrelevant here: Clark's claim is based on matters that appear all over the face of the trial record.

We conclude that the district court erred in holding that the state court's application of section 440.10(2)(c) did not constitute an adequate state procedural bar to Clark's federal habeas petition. Moreover, even if no state court had applied section 440.10(2)(c) to Clark's claim, the district court itself should have done so in the first instance pursuant to the exhaustion requirement for federal habeas. See, e.g., Sweet, 353 F.3d at 140 (applying section 440.10(2)(c) to claims raised for the first time in federal habeas petition).

**C**

27

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998) (citations and internal quotation marks omitted), quoted in DiSimone v. Phillips, 461 F.3d 181, 190 (2d Cir. 2006). Actual innocence is not in issue here; so cause and prejudice analysis is the only route to the merits. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded . . . efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Because the district court had no occasion to consider whether any objective factor external to Clark impeded her appeal, we could remand for such a determination. See, e.g., McKethan v. Mantello, 292 F.3d 119 (2d Cir. 2002) (holding that claims were procedurally barred through improper exhaustion and remanding for the district court to dismiss on the merits or apply cause and prejudice analysis). But the district court's conclusion that, under state law, Clark was justified in her failure to appeal makes plain that any

28

cause and prejudice inquiry on remand would be bound up in the merits of Clark's claim. In the district court's view, the purported constitutional violation itself--allowing Clark to act pro se without appointed or stand-by counsel-- was the primary reason Clark failed to timely appeal; this would be an "external" factor only if it were truly a violation. As we discuss infra, however, the circumstances at Clark's trial gave rise to no violation of the right to counsel; we dispose of the remainder of the appeal on the merits because a remand would be futile.

## II

Clark argues that the trial court violated her Sixth Amendment right to counsel by (1) allowing her to represent herself when it was clear that she would not abide by courtroom protocol and (2) allowing her to represent herself without stand-by counsel after she absented herself from the courtroom as a political protest against the trial court's legitimacy. The district court accepted Clark's argument.

We rejected an identical claim in Torres v. United States, 140 F.3d 392 (2d Cir. 1998).

## A

Before turning to the merits of Clark's claims, we resolve the threshold issue of whether the district court erroneously withheld AEDPA deference from the state court decision.  In order to determine whether to apply AEDPA deference, habeas courts examine "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances," and then decide whether the state court's decision was "(1) fairly appearing to rest primarily on federal law or to be interwoven with federal law or (2) fairly appearing to rest primarily on state procedural law." Jimenez, 458 F.3d at 145 & n.16 (2d Cir. 2006).  The habeas court looks to the last state court decision rendering a judgment on the petitioner's federal claim.  See Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006).  Unless this last decision clearly relies on a state procedural ground, the claim was decided on the merits and AEDPA deference applies. Id.

Here, we have two state court decisions.  First, the Rockland County Supreme Court opinion cited Clark's unjustifiable failure to take an appeal under section 440.10(2)(c) as a procedural bar to the review of the merits of her claim.  That court did discuss the merits in detail,

but the discussion was by way of explanation for the statement that "were the court to consider defendant's claim of a deprivation of her constitutional right, it would find the claim completely meritless." By its own terms, therefore, the Rockland County Supreme Court announced that it was not basing its judgment on the merits of Clark's federal claim, but on a state procedural bar.

The Appellate Division then denied Clark leave to appeal, without comment. The State argues that this was the decision that disposed of Clark's claim. But the denial of leave to appeal does not speak directly to the soundness of any particular reasoning below; even if leave to appeal were granted, the court might deny relief on the merits. There is no reason to assume that leave to appeal was denied for any reason other than agreement with the lower court's application of the state procedural bar.

Accordingly, we review the merits of Clark's habeas petition de novo.

**B**

"The [Sixth Amendment] right to counsel is a fundamental right of criminal defendants; it assures the

31

fairness, and thus the legitimacy, of our adversary process." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." Faretta v. California, 422 U.S. 806, 819 (1975). The defendant's right to counsel does not generally empower courts to force counsel upon a criminal defendant. The Sixth Amendment "contemplate[s] that counsel . . . shall be an aid to a willing defendant--not an organ of the State interposed between an unwilling defendant and his right to defend himself personally." Id. at 820. A defendant therefore has a constitutional right to waive the right to assistance of counsel and present her own defense pro se, if the decision is made "knowingly and intelligently." Id. at 835 (internal quotation marks omitted). The record should reflect that the choice was made with an "aware[ness] of the dangers and disadvantages of self-representation." Id.

The right to self-representation may tend to run at cross-purposes to the right to effective assistance of counsel. See id. at 832. For this reason, we exercise caution when called upon to establish per se rules that might overprotect either of these rights.

32

As it stands, the right to self-representation is not without limits. The right "is not a license to abuse the dignity of the courtroom." Id. at 834 n.46. A trial court may deny the right to act pro se where the defendant "deliberately engages in serious and obstructionist misconduct," id., or is not "able and willing to abide by rules of procedure and courtroom protocol." McKaskle v. Wiggins, 465 U.S. 168, 173 (1984).

Even if the right has been validly invoked, a judge may qualify it by appointing stand-by counsel, with or without the defendant's consent, to "aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary," Faretta, 422 U.S. at 834 n.46, or "to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of [her] own clearly indicated goals." Wiggins, 465 U.S. at 184.

Stand-by counsel's participation is limited in two ways: (1) the defendant has the right to preserve actual control over the content of the case presented to the jury, and so standby counsel is not allowed to "make or

33

substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak _instead_ of the defendant on any matter of importance"; and (2) standby counsel's participation must not be allowed to destroy the jury's perception that the _pro se_ defendant is representing herself. _Wiggins_, 465 U.S. at 178-79 ("[T]he right to appear _pro se_ can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised."). In addition, "there is no constitutional right to hybrid representation," _Schmidt v. United States_, 105 F.3d 82, 90 (2d Cir. 1997), whereby a defendant who represents herself can "choreograph special appearances by [standby] counsel." _Wiggins_, 465 U.S. at 183. Instead, "[t]he decision to grant or deny hybrid representation lies solely within the discretion of the trial court." _United States v. Tutino_, 883 F.2d 1125, 1141 (2d Cir. 1989) (internal quotation marks omitted).

Clark also raises issues in connection with her absence from trial. A defendant has the right under the Confrontation Clause to be present when evidence is introduced against her, as well as a due process right "to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to

34

the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745 (1987). The same disruptive and obstructionist conduct that may justify revocation of pro se status also serves as a constructive waiver of the right to be present at trial, provided that the trial judge warns the defendant that she will be removed if she persists and that the defendant is permitted to return to the courtroom at such time as she agrees to behave. See Illinois v. Allen, 397 U.S. 337 (1970).

**C**

The district court held that the state trial court violated Clark's Sixth Amendment rights by accepting Clark's application to appear pro se, notwithstanding clear indications that Clark had no intention of following the trial court's rules; and by allowing the trial to continue without revoking Clark's pro se status (or appointing stand-by counsel) after Clark refused to participate in or attend her trial. The district court's first holding implies that a waiver of right to counsel is constitutionally infirm where the record indicates that the defendant was unwilling to abide by courtroom protocol. The second implies that a trial court must, as a constitutional matter, construe a pro

35

se defendant's waiver of the right to be present at trial as invalidating her waiver of the right to counsel.

We decline to adopt any such per se rules, and hold that there was no constitutional violation because Clark knowingly and intelligently waived her right to counsel, unequivocally asserted her right to self-representation, made a conscious strategic choice to waive her right to be present in the courtroom as part of a de facto political protest defense, and was afforded the opportunity to return whenever she chose.[6]

This conclusion flows directly from Torres, 140 F.3d 392, which held that near-identical facts did not give rise to a Sixth Amendment violation. Torres, a member of the Puerto Rican nationalist revolutionary group FALN, was indicted in connection with a 1977 bombing in New York City. See 140 F.3d at 395. Torres characterized herself as a "freedom fighter" and a "prisoner of war." Id. at 395-96. She refused to follow the court's rules, waived her right to counsel, and declined to participate in her own trial, choosing to withdraw to a holding cell where she listened to

---

[6] The record suggests that the trial judge conducted himself admirably, handling the seriously disruptive and obstructionist conduct of Clark and her co-defendants with endless patience.

36

the proceedings on a speaker. See generally id. at 395-400. She called no witnesses and instead relied on her own political rhetoric challenging the court's illegitimacy. Her "trial tactics . . . included leading courtroom demonstrations of political supporters in the gallery," and "[t]hroughout the proceedings, Torres spoke frequently, often restating her political beliefs." Id. at 402. She received assistance from legal advisors "at various stages of the proceedings," id. at 396 n.3, 397, but when she walked out during jury selection, her legal advisor followed.[7]

In short, the facts in Torres closely mirror the circumstances of Clark's trial, as well as the procedural context: Almost two decades after her conviction, Torres brought a federal habeas petition claiming that the trial court violated her Sixth Amendment rights by failing to revoke her pro se status (and appoint standby counsel) after she refused to follow the court's rules or appear at trial. She argued that as a result of that failure, her conviction

_____

[7] The trial judge in Torres appointed amicus counsel to argue defendant's side of a particular sentencing issue; that argument took place outside of the presence of the jury. Torres, 140 F.3d at 397-98. At no point was Torres represented by counsel in the presence of the jury, even after she retreated to her holding cell.

was "entered pursuant to a non-adversarial proceeding," in violation of the Constitution. Id. at 402.

We observed that, "[b]y not participating in her trial, she was clearly trying not only to challenge the jurisdiction of the court, but also to incur political sympathy for her position." Id. Accordingly, we concluded that "Torres' decision not to participate in the proceedings did not undermine her knowing and intelligent waiver. Indeed, it is clear that she exercised her right to defend herself so that she could further her political objectives as a Puerto Rican freedom fighter." Id.

Torres emphasized "that the Sixth Amendment right to waive counsel, like all procedural protections for a criminal defendant, stems in part from the sanctity of freedom of choice." Id. Thus, "[j]ust as district courts should not compel a defendant to accept a lawyer she does not want, they should not interfere with the defendant's chosen method of defense." Id. (internal citations and quotation marks omitted).

Clark does not allege that her waiver of counsel was anything less than knowing, intelligent, and unequivocal. Rather, like Torres, she complains that the trial judge violated her Sixth Amendment rights when he allowed her to

appear pro se--without invalidating or qualifying her waiver of the right to counsel--after she had given ample notice of her intention to use a "disruptive, political defense," including an unwillingness to be present at trial. Appellee Br. at 5.

At oral argument, Clark's counsel conceded that Clark "adopt[ed] a conscious strategy to use [her] trial to further [her] political objectives and to challenge the jurisdiction of the court and win political sympathy." Oral Arg. Tr., February 26, 2007. The record confirms that Clark's trial was intensely adversarial. Clark introduced herself to the jury as "an anti-imperialist freedom fighter" who refused to "recognize the legitimacy of this Court." She then left the courtroom in protest. She petitioned the court for prisoner-of-war status. She moved (successfully) for the government to produce an incarcerated witness whom she identified as a "New Afrikan prisoner of war," and conducted direct examination--albeit brief--of that witness. Clark's lengthy closing statement explained to the jurors that she was "struggling to bring to light a radically different p[er]spective on the facts and fictions" presented at trial. While noting that "[p]erhaps it will not change

39

your minds," Clark said that "[o]ne way that it was apparent was by our absence because we did not want to lend credence to this ritual." Thus Clark openly conceded that her absence was a tactic to influence the jury in her favor.

In conclusion, we hold that Clark's Sixth Amendment claims fail on the merits. She complains that the judge conducted the trial in a manner that violated her constitutional rights. It was, however, her choice to conduct her trial in that manner, and she made the choice in part to achieve what she perceived as tactical advantages, rejecting the trial judge's warnings of the risks involved. If she faced trial without advantages guaranteed by the Sixth Amendment, that was not by the trial judge's imposition, but by her own informed choice, which the trial judge was bound to respect. Her claim of violation of her constitutional rights has no merit whatsoever.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is REVERSED.