UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2021

(Argued:  September 28, 2021      Decided:  May 5, 2022)

Docket No. 20-3317-cv

———————————————

GIGI JORDAN,
*Petitioner-Appellee,*

v.

AMY LAMANNA, in her official capacity as Superintendent of the Bedford Hills
Correctional Facility,
*Respondent-Appellant.*

———————————————

Before:      LEVAL, SACK, and PARK, *Circuit Judges.*

The respondent-appellant Amy Lamanna, in her official capacity as Superintendent of the Bedford Hills Correctional Facility, appeals from an order granting a writ of habeas corpus to the petitioner-appellee Gigi Jordan.  Jordan was convicted of manslaughter in New York State Supreme Court for administering a fatal dose of prescription medication to her eight-year-old son.  In the midst of the highly publicized trial, the courtroom was closed to all spectators for approximately fifteen minutes, during which the prosecutor addressed a website and an email detailing complaints by Jordan that her trial was unfair.  Jordan moved to set aside her conviction on the ground that her Sixth Amendment right to a public trial had been violated.  The New York Appellate Division rejected her claim; the New York Court of Appeals declined to hear an appeal from that decision, and the United States Supreme Court denied her petition for a writ of certiorari.  The United States District Court for the Southern District of New York (Sarah L. Cave, *M.J.*), on a petition for a writ of habeas corpus, concluded that the Appellate Division had unreasonably applied clearly established federal law in holding that there was no Sixth Amendment violation.  The district court granted Jordan's petition and ordered a

new trial.  We conclude that the ruling of the New York Appellate Division was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  We therefore

> REVERSE the judgment of the district court, and REMAND with instructions for the court to deny the petition for a writ of habeas corpus.

> MICHAEL B. KIMBERLY, McDermott Will & Emery LLP, Washington, DC (Norman H. Siegel, Siegel Teitelbaum & Evans, LLP, New York, NY; Earl S. Ward, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, New York, NY, *on the brief*), *for Petitioner-Appellee*;

> VINCENT RIVELLESE (Christopher P. Marinelli, *on the brief*), *for Cyrus R. Vance, District Attorney of New York County, New York, NY, for Respondent-Appellant.*

SACK, *Circuit Judge*:

Petitioner-appellee Gigi Jordan was tried and convicted in New York State Supreme Court for administering a fatal dose of prescription medication to her eight-year-old son.  After several weeks of what became a nine-week trial, the presiding justice closed the courtroom to all spectators, at the State's request, for approximately fifteen minutes.  During the closure, the State brought to the court's attention a website titled "The Inadmissible Truth," which alleged that the court had wrongly excluded evidence from the trial, and an email from Jordan

2

disseminating the website to over one hundred contacts. The State asked the court to repeat its instruction to the jury not to consume media coverage of the trial, and for reassurance that no one on the defense team was responsible for the website. Defense counsel objected repeatedly to the closure of the courtroom. After the courtroom was reopened, the court gave the repeated instruction to the jury. A few hours later, the court unsealed the minutes of the closed hearing and the two exhibits containing the website and the email.

Jordan moved to set aside her conviction, alleging a violation of her Sixth Amendment right to a public trial. The trial court denied the motion. On direct review, the Appellate Division, First Department, rejected the claim and affirmed her conviction. The New York Court of Appeals declined to hear the case, and the United States Supreme Court denied a petition for a writ of certiorari. Jordan then petitioned for a writ of habeas corpus in the United States District Court for the Southern District of New York.

Magistrate Judge Sarah L. Cave, sitting as the district court by consent of the parties pursuant to 28 U.S.C. § 636(c), granted the writ, holding that the Appellate Division had unreasonably applied clearly established federal law. *Jordan v. Lamanna*, No. 18-cv-10868, 2020 WL 5743519 (S.D.N.Y. Sept. 25, 2020).

3

We conclude that granting the writ was error, and we therefore reverse and remand with instructions to the district court to deny the petition for a writ of habeas corpus.

## BACKGROUND

### *Factual Background*

On the evening of February 3, 2010, Gigi Jordan, a pharmaceutical company executive who lived near Columbus Circle in Midtown Manhattan, took her eight-year-old son, Jude Mirra, to a room in the Peninsula Hotel at the corner of 55th Street and Fifth Avenue in New York. Sometime during the next day-and-a-half, Jordan administered a fatal dose of prescription medication to her son. She also ingested multiple medications herself, then emailed her aunt to tell her what she had done. On the morning of February 5, 2010, Jordan's aunt contacted law enforcement. The police went to the hotel, where they found Jude's lifeless body on the bed and Jordan lying awake on the floor.

### A. Indictment and Trial

On February 8, 2010, a New York Grand Jury charged Jordan with murder in the second degree under New York Penal Law § 125.25. On September 3, 2014, Jordan proceeded to a jury trial before Justice Charles Solomon in New

4

York State Supreme Court. The State presented 26 witnesses, including hotel staff, a police officer, toxicologists, and one of Jude's teachers. The defense witnesses included acquaintances of Jordan and Jude, a certified trauma therapist, a forensic expert, and Jordan herself.

Jordan asserted an affirmative defense of extreme emotional distress. Under New York law, the defense allows a person who has committed intentional murder to be convicted of first-degree manslaughter instead if she can establish, by a preponderance of the evidence, that she acted under the influence of an extreme emotional disturbance. N.Y. Penal Law § 125.25(1)(a). Jordan testified that she thought Jude had been sexually abused by his biological father, Emil Tzekov, who was Jordan's second husband. She also testified that she thought she would be murdered by her first husband, Raymond Mirra, and that upon her death, Jude would fall under Tzekov's care and be subject to further abuse. She testified that she killed her son to save him from that future.

Jordan's trial lasted approximately nine weeks, unsurprisingly garnering significant media attention. On November 5, 2014, after deliberating for several days, the jury accepted Jordan's affirmative defense and convicted her of manslaughter in the first degree.

### B. Closed Proceeding

The closed proceeding at issue took place on the morning of October 1, 2014, about one month into Jordan's trial (the "Closed Proceeding"). Before the jury was brought into the courtroom, and after an unrecorded sidebar with the prosecutor, Justice Solomon asked all spectators to leave "for about five minutes, about something that has to be done in private." JA.18. Jordan and her counsel remained in the courtroom, but all of the spectators left, the courtroom door was closed, and an officer was posted outside the door.

The court then explained that "[the prosecutor] wants to make a record about something that he didn't want to put on the record in front of the audience or the press," about "a very serious problem concerning Ms. Jordan." JA.19, 20. Defense counsel objected to the closure of the courtroom; the objection was overruled.

The State proceeded to bring to the court's attention a website called "The Inadmissible Truth," which had been posted on the internet the night before. The site included links to several articles, all of which accused the court of undermining the fairness of the trial by refusing to admit certain evidence. The State also gave the court a copy of an email that Jordan had sent to more than one

6

hundred email addresses, many of which appeared to be media contacts. The

body of the email read:

> For more than four and a half years, I have awaited trial with one
> thought in mind, that I would finally be able to tell the whole story of
> the torment my son endured and how and why this horror happened.
> Sadly, I've learned that the justice system will not allow this story to
> be told. The truth seeking process that I believe the justice system to
> be is stymied on many fronts resulting in the suppression of evidence
> that anyone would expect to hear at a fair trial. The prosecutor in my
> case has repeatedly admonished the jury that they must not expect to
> hear why this happened. I posted this website in the hope that the
> truth will come out.
>
>     --Gigi Jordan

JA.48. The court marked both documents as exhibits.

Justice Solomon noted that he had "never had this happen before" and

asked the State what it was seeking. JA.24-25. The State asked the court to

repeat its instruction to the jury about avoiding media coverage of the trial.

Defense counsel did not object to this request. The State also asked for "some

assurance that nobody on the defense team" was "in violation of your Honor's

ruling and the ethical standards." JA.25. Earlier in the Closed Proceeding, the

prosecutor had said, "I am not, in any way, suggesting that any of the defense

attorneys have knowledge of [the website or the email] . . . . I'm not accusing

anyone of anything." JA.21.

Defense counsel again objected to the closure of the courtroom. The defense insisted that "the closed courtroom is not requested by us, is not necessary for us, is and remains unconstitutional and there is absolutely nothing in the record that [the State] just made that could conceivably justify the closure of the courtroom." JA.26. The prosecutor explained that, given the publicity of the trial, he wanted to avoid the "feeding frenzy" that "would ensue from the defendant's desperate act of . . . trying to get into the public domain matters that this Court has ruled are inadmissible." JA.24.

A lengthier exchange between the court and defense counsel followed, during which the court repeatedly asked where the website came from, defense counsel continued to object to the closure of the courtroom, and both counsel and the court agreed that for an attorney to disseminate the website would be unethical.

Towards the end of the Closed Proceeding, defense counsel moved to unseal the minutes of the proceeding and the two marked exhibits. The court denied the motion, but invited defense counsel to make a written application to unseal them. The court also noted that there was no "gag order" on what transpired in the proceeding, i.e., those present were free to disseminate

information about it. After a few more unproductive exchanges about who was responsible for the website, during which the prosecutor asked "[i]s [sic] the last ten minutes fruitful?," the court reopened the courtroom to the public. JA.38.

After the jury returned, the court repeated its instruction that they avoid media coverage of the trial. The courtroom had been closed for about fifteen minutes.

Later that afternoon, the court asked the prosecutor whether the minutes of the Closed Proceeding needed to remain sealed. The court explained, "[M]aybe it was an erroneous ruling. Maybe this should be in the public domain, I don't know. I'm trying to think of the reason why it shouldn't. I can't think of a reason." JA.43. The court then unsealed the minutes and the two exhibits. Jordan's trial continued for five more weeks – the verdict was handed down on November 5, 2014.

*Procedural History*

After her conviction, Jordan filed a motion to set aside her verdict pursuant to New York Criminal Procedure Law § 330.30. She argued, *inter alia*, that her Sixth Amendment right to a public trial had been violated. On May 28, 2015, Justice Solomon denied the motion. He reasoned that the closure of the

9

courtroom, which "was completely tangential to the trial and had nothing to do with the evidence in the case," did not violate Jordan's Sixth Amendment rights. JA.66. Even if the Sixth Amendment did reach this type of procedure, the court concluded, the error would have been trivial. On May 28, 2015, Justice Solomon sentenced Jordan to 18 years' imprisonment followed by five years of supervised release.

Jordan appealed to the Appellate Division of the Supreme Court of the State of New York (the "Appellate Division"). On December 22, 2016, the Appellate Division affirmed the judgment. The court reasoned, in relevant part:

> [Jordan's] Sixth Amendment right to a public trial was not violated when the court briefly closed the courtroom during a discussion of a legal matter relating to protecting the jury from exposure to publicity about the case. This was the equivalent of a sidebar, robing room or chambers conference. The right to a public trial does not extend to such conferences, and does not restrict judges "in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings." [*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 598 n.23 (1980); *see People of Olivero*, 289 A.D.2d 1082 (4th Dep't 2001).] Moreover, the conference had no impact upon the conduct of the trial other than having the court repeat its previous instructions about trial publicity and minutes and exhibits that had been sealed were unsealed the same day.

*People v. Jordan*, 145 A.D.3d 584, 585 (N.Y. App. Div. 1st Dep't 2016).

Jordan sought leave to appeal to the New York Court of Appeals. On May 3, 2017, her petition was denied. *People v. Jordan*, 29 N.Y.3d 1033 (2017). On

November 27, 2017, the United States Supreme Court denied Jordan's petition for a writ of certiorari. *Jordan v. New York*, 138 S. Ct. 481 (2017).

On November 20, 2018, Jordan petitioned the United States District Court for the Southern District of New York for a writ of habeas corpus under 28 U.S.C. § 2254. Magistrate Judge Sarah L. Cave, acting as the district court by consent of the parties, granted the writ. *Jordan v. Lamanna*, No. 18-cv-10868, 2020 WL 5743519 (S.D.N.Y. Sept. 25, 2020). She concluded that the Sixth Amendment public-trial right applied to the Closed Proceeding and that, in reaching the opposite conclusion, the Appellate Division had unreasonably applied clearly established Supreme Court precedent. *Id.* at *11-13. The district court further concluded that the courtroom had been impermissibly closed; the violation was not trivial; and the proper remedy was a new trial. *Id.* at *13-20. On November 12, 2020, Jordan was released pending appeal. *Jordan v. Lamanna*, No. 18-cv-10868, 2020 WL 6647282 (S.D.N.Y. Nov. 12, 2020).

The State – through Amy Lamanna, the Superintendent of the Bedford Hills Correctional Facility, where Jordan was serving her sentence – appealed to this Court.

11

**DISCUSSION**

I. Standard of Review

"We review a district court's grant or denial of habeas corpus *de novo*, and the underlying findings of fact for clear error." *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008) (citing *Clark v. Perez*, 510 F.3d 382, 389 (2d Cir. 2008)).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, enacted in 1996:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d).

A claim is "adjudicated on the merits" if the state court ruled on the substance of the claim rather than on a procedural ground. *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

A writ cannot be granted "simply because . . . the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, whether a decision is "contrary to" or an "unreasonable application of" clearly established federal law is a "substantially higher threshold" than mere incorrectness. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). AEDPA "does not require state courts to *extend* [the Supreme Court's] precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis in original). The writ should be granted on grounds of unreasonableness only if "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In other words, the

13

existence of "reasonable arguments on both sides" is "all [the government] needs to prevail in [an] AEDPA case." *White*, 572 U.S. at 427.

   II.   Sixth Amendment Claim

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. That guarantee applies to the states through the Fourteenth Amendment. *In re Oliver*, 333 U.S. 257, 266-73 (1948).

The Supreme Court has, in two cases, extended this public-trial right to specific proceedings "beyond the actual proof at trial."[1] *Waller v. Georgia*, 467 U.S. 39, 44 (1984); *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (per curiam). *Waller*

---

[1] As a threshold matter, we note that our inquiry only addresses the outer limits of the Sixth Amendment's scope, without questioning the well-established core – "the actual proof at trial." *Waller*, 467 U.S. at 44 (explaining that, before *Waller*, the Court had "never considered the extent to which [the public-trial] right extends beyond the actual proof at trial"); *see also Presley*, 558 U.S at 212 ("The *Waller* Court . . . [concluded] that the Sixth Amendment right to a public trial extends beyond the actual proof at trial."). The traditional phases of proving a defendant's guilt – witness testimony, cross-examination, closing arguments – are clearly subject to the public-trial right. Habeas cases that have faulted the trial judge for closing the courtroom during actual witness testimony – some of which are raised by Jordan, *see* Appellee's Br. 29 (citing *English v. Artuz*, 164 F.3d 105 (2d Cir. 1998); *Vidal v. Williams*, 31 F.3d 67 (2d Cir. 1994)) – are thus inapposite, because those cases did not require an analysis of the Sixth Amendment's scope "beyond the actual proof at trial."

first extended the public-trial right to a pretrial suppression hearing.  467 U.S. at

47.  The Court emphasized the significance of suppression hearings to the

outcome of criminal trials, reasoning that "suppression hearings often are as

important as the trial itself," and "in many cases, the suppression hearing was the

only trial, because the defendants thereafter pleaded guilty pursuant to a plea

bargain."  *Id.* at 46-47.

*Presley* further extended the public-trial right to jury voir dire.  558 U.S. at

213.  In doing so, the Court relied on the parallel First Amendment right of the

press to attend criminal trials, which the Court first recognized in *Richmond*

*Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).  In a subsequent case, *Press-*

*Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984) (*Press-Enterprise I*),

the Court applied the First Amendment public-trial right to jury voir dire,

relying on both the historically open nature of jury selection, *id.* at 506-08, and the

continuing importance of the jury selection process "not simply to the

adversaries but to the criminal justice system," *id.* at 505.  The *Presley* Court

reasoned that although

> [t]he extent to which the First and Sixth Amendment public trial
> rights are coextensive is an open question, . . . there is no legitimate
> reason, at least in the context of juror selection proceedings, to give
> one who asserts a First Amendment privilege greater rights to insist

on public proceedings than the accused has.

558 U.S. at 213. The Court therefore extended the Sixth Amendment to cover

jury selection as well.

Neither *Waller* nor *Presley* clearly establishes whether the Sixth

Amendment extends to the Closed Proceeding, which does not share the

historically open nature of jury selection, nor the functional importance of

suppression hearings.[2] At the very least, "fairminded jurists could disagree" such

as to preclude habeas relief. *Yarborough*, 541 U.S. at 664. Unsurprisingly, in light

of the unorthodox circumstances that gave rise to the Closed Proceeding, we find

no historical precedent supporting a tradition of holding such hearings in public.

And the Closed Proceeding could not be said to have played a vital role in the

trial, as it did not appear to have any substantive impact on the case. The Closed

---

[2] Again, the analogous First Amendment context is instructive. In *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986) (*Press-Enterprise II*), the Supreme Court explained that "two complementary considerations" are relevant for determining if the public-trial right attaches: whether there is a "tradition of accessibility," and whether the proceeding "plays a particularly significant positive role in the actual functioning of the process." *Id.* at 8-11; *see also id.* at 9 ("If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches."). This dual inquiry mirrors the Supreme Court's reasoning in *Waller* and *Presley*.

Proceeding did not involve any evidence that would eventually be shown to the jury, nor did it deal with evidence that a party wished to admit but was excluded. In addition, the transcript of the Closed Proceeding was released to the public shortly after the closure ended. The only consequence of the Closed Proceeding was that the court repeated a basic instruction to the jury about not consuming media coverage of the trial.

The district court "examine[d] the nature of the proceeding at issue" and concluded that "[the] events during the Closed Proceeding were of the character that would typically be conducted publicly." *Jordan*, 2020 WL 5743519, at *11-12. Specifically, the district court listed several reasons why, in the district court's view, the Closed Proceeding was distinct enough from an "off-the-record chambers conference" such that the Sixth Amendment must apply. *Id.* at *12. We do not find them to be persuasive.

The district court noted that "Justice Solomon presided from the bench, counsel spoke from their respective positions in the courtroom, and Jordan herself was in the courtroom," but these observations say nothing about the

17

substantive impact of the proceeding[3] or the historical precedent for conducting

such proceedings in public. *Id.* Justice Solomon marked the website and email

as exhibits, but the mere marking of exhibits for organizational purposes is

hardly tantamount to entering them into evidence for consideration by the jury.

The district court also said that Justice Solomon made several "rulings"

during the Closed Proceeding, but three of the four rulings—closing the

courtroom, not imposing a gag order, and sealing the minutes and exhibits—

were about the Closed Proceeding itself. These rulings had no relation to the

question of Jordan's guilt or innocence. The fourth "ruling" was simply a

repeated instruction to the jury not to consume media coverage of the trial,

which was unobjected to by the defense and at most sought to ensure that the

trial was being conducted properly.

---

[3] We agree with the State that the district court's reasoning "elevate[s] form over substance." Appellant's Br. 24. *Waller* did observe that "a suppression hearing often resembles a bench trial: witnesses are sworn and testify, and of course counsel argue their positions." 467 U.S. at 47. Taken as a whole, however, *Waller*'s analysis hinged upon the substantive impact that suppression hearings often have on the defendant's case. *See id.* at 46-47 ("[S]uppression hearings often are as important as the trial itself . . . . [I]n many cases, the suppression hearing was the only trial, because the defendants thereafter pleaded guilty pursuant to a plea bargain. . . . The outcome frequently depends on a resolution of factual matters.").

Ultimately, any argument that applies *Waller* and *Presley* to the Closed

Proceeding would require extending Supreme Court precedent to this sort of

wholly ancillary proceeding. Under AEDPA, state courts are not obligated to do

so.[4] *See White*, 572 U.S. at 426. Because "[i]t is an open question whether a

defendant's right to a public trial encompasses the sort of nonpublic proceeding

at issue here," *Titus*, 958 F.3d at 692-93 – in other words, because there is no

"clearly established Federal law" on this question – it was not unreasonable for

the Appellate Division to deny Jordan's claim.

Jordan also argues that the Supreme Court has specified steps the trial

court must follow "before excluding the public from any stage of a criminal trial."

*Presley*, 558 U.S. at 213. Those steps, which were first articulated in *Waller* and

adopted from *Press-Enterprise I*, are the following: "[T]he party seeking to close

---

[4] Of course, "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (internal quotation marks omitted). But that observation does not save Jordan's claim. The fact that the Closed Proceeding was neither a suppression hearing nor a jury selection is not what bars habeas relief. Rather, as discussed above, Jordan's claim fails because there is no "clearly established Federal law" on whether a proceeding of this kind is subject to the public-trial right. Nothing in this opinion *precludes* courts from extending the public-trial right to new contexts, if such an extension is consistent with existing law. On habeas review, we merely cannot *require* a state court to make such an extension.

the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48. Because Justice Solomon closed the courtroom without following these steps, Jordan contends that her conviction must be vacated. We disagree. Even if Jordan is correct as to the trial court's error, she cites no Supreme Court precedent, nor are we aware of any, that clearly establishes the remedy for a trial court's closure of the courtroom without following the four steps described in *Waller*. Specifically, the Court has never said, much less ruled, that any conviction following an erroneous closure must be vacated.[5]

The Sixth Amendment's public-trial right is a fundamental protection for the defendant and the public at large. But on review of a habeas petition, we are bound by AEDPA. We need not decide whether the courtroom should have

---

[5] In *Waller* itself, the Court did not vacate the conviction despite finding that the trial court erroneously closed the courtroom. The Court reasoned that "[i]f, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." 467 U.S. at 50. *Waller* simply instructed that "the remedy should be appropriate to the violation," which does not clearly establish whether a new trial was required here. *Id.* at 49.

been kept open during the fifteen minutes that the prosecutor shared "The Inadmissible Truth." We conclude, based on the relevant Supreme Court decisions, that there are at least reasonable arguments supporting the Appellate Division's ruling. That is enough to preclude habeas relief.

## CONCLUSION

We have considered the petitioner's remaining arguments on appeal and conclude that they are without merit. We therefore REVERSE the judgment of the district court, and REMAND with instructions for the court to deny the petition for a writ of habeas corpus.